Filed 2/17/21  P. v. Zaki CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B300980 |
| Plaintiff and Respondent, | Los Angeles County |
| v. | Super. Ct. No. BA471176 |
| ROBERT E. ZAKI, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Katherine Mader, Judge. Affirmed.

The Justice Firm and Joseph Virgilio for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Blythe J. Leszkay and Charles S. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

Defendant Robert E. Zaki was convicted of forcible oral copulation and assault with intent to commit forcible oral copulation. On appeal, Zaki contends: (1) the court erred in admitting evidence of his prior uncharged acts of sexual misconduct; (2) insufficient evidence supports both convictions; (3) the prosecutor committed prejudicial misconduct during oral argument; and (4) a technical defect in the verdict form requires reversal of his conviction for forcible oral copulation.[1] As we explain, all these arguments lack merit. We therefore affirm.

## FACTS AND PROCEDURAL BACKGROUND

### 1. The Charged Sexual Assault

In November 2017, Monica O. performed in an acting showcase. After the show, she met Zaki, who gave her a fake name and claimed he was a financier for a major movie production company. Zaki told Monica that she would be great in one of his films. He claimed he was very wealthy and liked to support artists, and he offered to pay Monica $2,000 a month to help her pursue her acting career. Zaki and Monica exchanged phone numbers.

After going to a nearby restaurant, Monica drove Zaki to his house. Although Monica intended to just drop Zaki off, he convinced her to come inside his house to "look at the view" and try a "ginger elixir." While Monica was looking out the window,

---

[1] In his opening brief, Zaki argued his trial counsel rendered ineffective assistance by not calling an expert witness to rebut the People's expert. Zaki expressly withdrew that argument in his reply brief, however. We therefore don't address that argument in this opinion.

Zaki approached her with a blanket and asked her to let him give her a massage. Monica reluctantly agreed because she wanted Zaki to provide the monthly allowance he promised her earlier that night and she wasn't "doing well" at the time.

Zaki asked Monica to remove her dress several times before she agreed to do so. Although she kept her bra and underwear on, Zaki grabbed her buttocks and put his hands under her underwear. Zaki then asked her, "Do you like anal?" Monica "freaked out," stood up, put on her dress, and ran to the front door of Zaki's house. As Monica tried to put on her shoes, Zaki, who was now completely naked, approached her and began masturbating.

While Monica was still crouched and trying to put on her shoes, Zaki grabbed her head, inserted his penis into her mouth, and started forcing her head back and forth. Monica started gagging, choking, and crying, but she was too scared to make Zaki stop. She didn't know if Zaki had any weapons, and she was scared that if she tried to escape before Zaki ejaculated, he would attack her. When Zaki ejaculated into Monica's mouth, he repeatedly told her to "drink daddy's milk."

According to Monica, everything was a "total blur" once Zaki assaulted her. Although she texted Zaki to say she made it home, she has no recollection of sending the message. Monica didn't report Zaki to the police immediately after the assault because she was in shock, wanted to forget what happened, and was afraid she could be blacklisted in the film industry if she got Zaki in trouble.

A few days after Zaki assaulted Monica, he texted her to hang out. Monica wanted to confront Zaki and have him apologize, but she didn't feel safe meeting him in private, so she

told him to meet her at the bar where she worked. When Zaki refused to meet Monica at the bar, she questioned him about the assault through text messages. After she described in detail what Zaki did to her, he claimed he "never did" any of those things and acted "surprised" by her accusations. Monica never texted Zaki again.

For a few months after the assault, Monica tried to forget what happened. In February 2018, she was reminded of the incident and began searching for information about Zaki. She discovered his real name and some "disturbing" information about him. Later that month, Monica reported the assault to the police.

When she met with a detective, Monica provided copies of some of the text messages she exchanged with Zaki. Monica provided only the messages in which she questioned Zaki about the assault; she omitted the messages they exchanged on the night of the attack and some of the messages they sent each other a few nights later before she confronted him about the incident.

## 2. Expert Testimony

A forensic psychologist testified. She explained how the behavior and memory of people who experience traumatic events, such as sexual assault victims, are affected by the event. While the perception of danger often causes a person to enter "fight, flight or freeze response mode," victims of sexual assault often do not believe fighting or fleeing are safe options so they will instead "freeze" during the attack. By freezing, a victim will often "dissociate," which makes it more difficult to accurately recall the details of the assault. Due to the traumatic nature of the assault, a victim may also consciously or subconsciously avoid thinking about the event. It is therefore typical for victims of sexual

4

assault to not think about the attack for several months after it occurs.

Most assaults are committed by people the victim knows. Thus, it is common for victims of sexual assault not to actively resist or cry out during the assault. Where the victim knows the attacker, about only 20 to 25 percent of victims actively resist. It is also common for sexual assault victims not to report the assault immediately after it occurs. While some never report the assault, many victims wait extended periods of time to report because they often think people won't believe the assault occurred. Many victims also delay reporting, or don't report, sexual assault because they feel ashamed or humiliated describing the incident to other people.

When posed with a hypothetical based on the facts of this case, the expert opined that it is not uncommon for the victim of a sexual assault to later contact the perpetrator. In 30 to 70 percent of cases where the victim previously knew the perpetrator, the victim may try to reconnect with the perpetrator to either repair the relationship or to seek help.

### 3. Prior Sexual Misconduct

#### 3.1. E.C.

In September 2002, Zaki used a fake name to contact E.C. through an online chatroom. Zaki convinced E.C. to meet him at his home later that night. After Zaki gave her a drink, E.C. realized she felt more intoxicated than usual after having only one alcoholic beverage.

When E.C. tried to leave, Zaki pulled her back into the house, closed the door, and said, "Bitch. Do you really think you're leaving here." Zaki then slapped E.C.'s face, pushed her,

spit on her, and threw her onto his couch. Zaki removed his clothes and threatened to rape E.C., telling her he could drown her in the pool and bury her in the backyard without anyone knowing.

Zaki then pulled E.C. toward him and told her to "suck his dick." When she refused, Zaki took E.C.'s hand and made her stroke his penis. Zaki fondled E.C.'s breasts and grabbed her head before ejaculating on her face and chest. Afterwards, Zaki told E.C. he knew where she lived and that he would harm her and her family if she reported him to the police.

### 3.2.   M.G.

In October 2002, M.G. met Zaki in an online chat room, where he was using a fake name. M.G. later picked Zaki up at his house. After trying to go to a pool hall, they returned to Zaki's house. While they sat in M.G.'s car in front of the house, Zaki started speaking to her in a sexual manner. When M.G. refused to go inside the house with him, Zaki started masturbating in her car and tried to grope her chest and genitals. When M.G. reached for her keys, Zaki slammed her head against the car window and threw the keys out the window. M.G. then saw a security guard and screamed for help. Zaki got out of the car and started yelling at M.G., "get out of my house, you fucking whore. Get the fuck out of here, you stupid bitch." M.G. drove away after finding her keys.

### 3.3.   B.S.

On the same night he contacted M.G., Zaki contacted B.S. in an online chat room. B.S. met Zaki at his house. After convincing her to come inside, Zaki offered B.S. a drink. While B.S. was sitting on the couch, Zaki came from behind her and put

6

his arms around her. B.S. was frightened and tried to leave. Zaki grabbed her and pushed her onto the couch. He then grabbed her breasts and reached up her skirt. Zaki got on top of B.S. and tried to force her to have sex with him. As B.S. was struggling to free herself, the police knocked on the front door to Zaki's house. The officers escorted B.S. out of the house.

### 3.4. H.D.

In 2015, H.D. received several unsolicited text messages from Zaki. He offered to pay her money and take her to dinner and a movie premiere. Zaki sent H.D. a photograph of himself and asked her to send him "naughty" photographs, but she never responded. In 2017, Zaki texted H.D. again. He sent her another photograph of himself and asked to meet her. H.D. responded that she was married and didn't know who Zaki was, and she asked him how he got her number. When Zaki replied that H.D.'s name "sounds familiar," H.D. stopped replying. Zaki then sent her a photograph of his penis.

## PROCEDURAL BACKGROUND

The People charged Zaki with forcible oral copulation (Pen. Code,[2] § 287, subd. (c)(2)(A); Count 1)[3] and assault with intent to

---

[2] All undesignated statutory references are to the Penal Code.

[3] At the time Zaki committed the offense, forcible oral copulation was codified under section 288a, subdivision (c)(2)(A). By the time the People charged Zaki in 2019, the offense had been renumbered as section 287, subdivision (c)(2)(A). The wording of the offense after the amendment and renumbering remained unchanged, however. (Compare § 287, subd. (c)(2)(A) with former section 288a, subd. (c)(2)(A).) The operative amended information lists section 288a, subdivision (c)(2)(A) as the applicable code section for the offense.

commit forcible oral copulation (§ 220, subd. (a)(1); Count 2). A jury found Zaki guilty of both offenses. The court sentenced Zaki to 21 years in prison.

## DISCUSSION

### 1.   Evidence of Prior Sexual Misconduct

Zaki contends the court abused its discretion when it admitted evidence of his prior acts of sexual misconduct. We disagree.

Prior to trial, the People moved to introduce evidence of seven prior uncharged acts of sexual misconduct Zaki committed against other women. Those incidents included: (1) Zaki sexually assaulting E.C. in his home in September 2002; (2) Zaki sexually assaulting M.G. in his car in front of his home in late October 2002; (3) Zaki sexually assaulting B.S. in his home in late October 2002; (4) Zaki sending unsolicited sexual text messages to H.D. in 2015 and 2017; (5) Zaki and several of his friends forcibly raping a woman in Zaki's home, including Zaki at one point holding the victim at knifepoint, in early October 2002; (6) Zaki sexually assaulting two women at gunpoint in his home in March 2002; and (7) Zaki drugging, raping, and threatening to kill a woman in a hotel room in June 2014. Zaki moved to exclude all evidence of his prior uncharged acts of sexual misconduct.

The court admitted evidence of Zaki sexually assaulting E.C., M.G., and B.S. and sending unsolicited sexual text messages to H.D. But the court excluded evidence of the other assaults, concluding they were either too inflammatory because Zaki brandished a weapon or made unduly prejudicial statements or they were too "complicated" and would result in an undue consumption of time.

8

The court found the evidence of Zaki's prior sexual misconduct against E.C., M.G., B.S., and H.D. was "extremely relevant" under Evidence Code section 1108 "to show that this is conduct that has gone on for a long number of years and it's not just an aberration in this case." With respect to evidence of Zaki sending unsolicited messages to H.D., the court found the incident was "sufficient to show what was going on sexually under [Evidence Code section] 1108 in the recent past that he is still using texting to try to lure women and still acting lewd and aggressively towards them when they show no interest in him."

Evidence of prior criminal acts is generally inadmissible to prove the defendant's conduct on a specific occasion. (See Evid. Code, § 1101, subd. (a); see also *People v. Cole* (2004) 33 Cal.4th 1158, 1194.) Where a defendant is charged with a sexual offense, however, evidence of the defendant's commission of other sexual offenses is admissible to prove the defendant's propensity to commit crimes of a sexual nature if such evidence is not inadmissible under Evidence Code section 352. (See Evid. Code, § 1108, subd. (a); *People v. Christensen* (2014) 229 Cal.App.4th 781, 756–796.) Evidence of the defendant's commission of other sexual offenses should be excluded under Evidence Code section 352 "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

"To determine whether section 1108 evidence is admissible, trial courts must engage in a 'careful weighing process' under section 352. [Citation.] 'Rather than admit or exclude every sex offense a defendant commits, trial judges must consider such factors as its nature, relevance, and possible remoteness, the

degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense. [Citations.]' [Citation.]" (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 823–824 (*Daveggio*).)

The court properly admitted evidence of Zaki's uncharged acts of sexual misconduct against E.C., M.G., B.S., and H.D. While the first three incidents occurred about 15 years before the assault charged in this case, they are nevertheless highly probative of Zaki's propensity to commit sex offenses since they involve conduct that is very similar to the manner in which Zaki committed the charged assault. In at least two of the prior incidents, Zaki used a fake name when he first approached his victims, like he did with Monica. In all three cases, Zaki lured the women to his house or his car, where he was able to isolate them, just as he did with Monica in this case. And, like in this case, Zaki became violent and physically prevented all three of the victims from fleeing after he made unprovoked sexual advances. Finally, in at least two of the prior cases, Zaki exposed himself without the victims' consent and forced the victims to touch his genitals, as he did to Monica in this case.

As for Zaki's text message conversations with H.D., they were relevant to show that, around the time of the charged assault, Zaki continued to engage in predatory sexual conduct toward women. Specifically, the evidence showed Zaki continued

10

to initiate contact with his victims, expose himself without his victims' consent, and make unwanted sexual advances toward his victims.

The court also properly balanced the remaining factors under Evidence Code section 352. The court allowed the People to introduce some, but not all, of Zaki's prior sexual misconduct, finding some of the other incidents involved conduct or statements that, while probative of his propensity to engage in such conduct, were too inflammatory. (*Daveggio*, *supra*, 4 Cal.5th at pp. 823–824.) The likely prejudicial impact of introducing the prior incidents was low since none of them involved conduct that was much more violent or inflammatory than the conduct giving rise to the charged assault. And the introduction of the prior instances of misconduct didn't result in an undue consumption of time, as each witness's testimony spans about 30 pages or fewer of the reporter's transcript. Nor was it likely that the evidence of the prior instances confused or misled the jurors since it is clear from the witnesses' testimony that the prior incidents were separate and distinct acts that were not part of the assault charged in this case.

To the extent Zaki contends the evidence of his prior acts of sexual misconduct shouldn't have been admitted because Evidence Code section 1108 is unconstitutional, the California Supreme Court has rejected that argument. (See *People v. Falsetta* (1999) 21 Cal.4th 903, 907, 922 [upholding Evidence Code section 1108, which permits a trial court to admit evidence of prior, uncharged sexual offenses when the defendant is charged with committing a sexual offense, under a due process challenge].) We are bound to follow the court's decision in

11

*Falsetta*. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

## 2. Sufficiency of the Evidence to Support Zaki's Convictions

Zaki next contends insufficient evidence supports his convictions for forcible oral copulation and assault with intent to commit forcible oral copulation. Zaki doesn't address any of the elements of either offense, nor does he explain why any of the evidence showing he physically assaulted Monica does not support his conviction for either offense. Instead, he addresses only the evidence of Monica's conduct following the assault. Zaki argues that because Monica waited to report him to law enforcement until after she discovered he had been accused of sexual misconduct in the past and realized he didn't intend to make the payments he promised her, she lacked credibility and fabricated her testimony about the underlying encounter. This argument lacks merit.

When a defendant claims insufficient evidence supports his conviction, we review the entire record in the light most favorable to the judgment to determine whether any rational trier of fact could have found the evidence proved the elements of the crime beyond a reasonable doubt. (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.) We draw all reasonable inferences in favor of the judgment. (*People v. Albillar* (2010) 51 Cal.4th 47, 59–60 (*Albillar*).) " ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.]" (*People v. Cravens* (2012) 53 Cal.4th 500, 508.) Thus, before we may set aside the judgment, it must be clear that

12

" ' "upon no hypothesis whatever is there sufficient evidence to support" ' [it]." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

Here, the jury heard Monica's testimony explaining why she waited several months before reporting Zaki to law enforcement. Among other reasons, Monica wanted to forget the assault happened and was afraid that she could jeopardize her career and reputation if she reported Zaki. The jury also heard the forensic psychologist's testimony that explained why victims of sexual assault don't resist the assault as it's happening and often wait extended periods of time before reporting the assault. The court also instructed the jury on how to evaluate the credibility of witnesses, how to weigh conflicting evidence, and how to draw conclusions based on the testimony of an expert witness.

It is a fundamental principle of substantial evidence review that we do not second guess or engage in our own credibility determinations. (*Albillar, supra,* 51 Cal.4th at pp. 59–60.) After evaluating the evidence under the standards provided by the court, the jury decided to believe Monica's testimony that the underlying sexual encounter was nonconsensual. We will not second guess that finding on appeal. (*People v. Young* (2005) 34 Cal.4th 1149, 1181 ["In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts."].)

## 3. Prosecutorial Misconduct

Zaki next argues that, on three separate occasions, the prosecutor made improper "Golden Rule" arguments by asking the jurors to place themselves in Monica's position when determining whether Zaki committed the charged offenses. As we

explain, Zaki forfeited his challenge to each alleged instance of misconduct. In any event, Zaki's claims lack merit.

### 3.1. Relevant Background

The prosecutor began her rebuttal argument by addressing Zaki's argument that the victim lacks credibility based on her text message history with Zaki: "I'm just going to address a few of the things defense counsel touched upon. And obviously, you keep hearing about these text message as though this entire case is about these text messages. And I think you know it's not. I think you know what the case is about is what happened. And English language is a very flawed thing and it's even more flawed in text messages. You can't hear a tone, people choose bad words. To be able to—to try to determine someone's credibility from a series of text messages is crazy. **Because I know most people would not want to be judged about their credibility regarding how they text.**"[4]

The prosecutor then addressed why the victim waited so long to inform the authorities about Zaki's assault, including a summary of the forensic psychologist's testimony on the behavior of sexual assault victims: "And the victim testified right after this incident occurred she was confused, she was traumatized, she was conflicted about what happened to her, and she still believed that this man might be able to help her crawl out of a hole that she had found herself in. [¶] And you heard the testimony of [the forensic psychologist] when she explained that that whole judgment thing in the front of your brain is greatly impacted by

---

[4] The language Zaki challenges is highlighted in bold.

trauma, you make decisions that you might not otherwise make. **And I know we've all experienced that** when you look at it after the fact and go why did I do that. Why did I do that? Because now you're looking at it in hindsight and you see it with clarity something you wouldn't see at the time because your brain is in a different mode. And, you know, you make decisions under stress that you wouldn't otherwise make."

Later in her rebuttal, the prosecutor continued to address why the victim waited several months to contact law enforcement after Zaki assaulted her: "And she even said that she was—she guessed that it was rape. The defense counsel asked you if you're willing to call it rape then why not call the police, right? Why not call the police if you're willing to call it rape in those text messages. No big deal. Like it's no big deal. **If that's the case then why do most women not call?**"

Zaki didn't object to the first two challenged statements. Although Zaki objected to the third statement, he only did so on the grounds that there was no evidence to support the prosecutor's statement. The court overruled the objection.

### 3.2.   Applicable Law and Standard of Review

A prosecutor commits prejudicial misconduct under the federal constitution when she engages in conduct that is so " ' " ' "egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " [Citations.]' " (*People v. Navarette* (2003) 30 Cal.4th 458, 506.) Under California law, a prosecutor commits reversible misconduct if she makes use of " 'deceptive or reprehensible methods' when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more

favorable to the defendant would have resulted." (*People v. Riggs* (2008) 44 Cal.4th 248, 298.)

A prosecutor is afforded "wide latitude" during closing argument. (*People v. Williams* (1997) 16 Cal.4th 153, 221 (*Williams*).) The argument may be vigorous and incorporate appropriate epithets as long as it amounts to fair comment on the evidence, and it may include reasonable inferences drawn from the evidence. (*Ibid.*) "[W]hen the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.) " 'In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]' " (*People v. Brown* (2003) 31 Cal.4th 518, 553–554.)

### 3.3.   Analysis

As a preliminary matter, Zaki has forfeited his claims of prosecutorial misconduct. To preserve such a claim for appeal, a defendant must make a timely and specific objection and request an admonition. (*People v. Clark* (2016) 63 Cal.4th 522, 577.) Otherwise, the argument is reviewable only if an objection would have been futile or an admonition would not have cured the harm caused by the misconduct. (*Ibid.*)

With respect to the first two challenged statements, Zaki never objected to them. As for the third statement, while Zaki objected that it lacked evidentiary support, he never argued the prosecutor improperly asked the jurors to place themselves in Monica's shoes before determining guilt. (*People v. Lopez* (1978) 81 Cal.App.3d 103, 108 ["An objection that specifies the wrong

16

ground is as bad as an insufficient general objection [citation]. Thus, objections to evidence must state specific grounds for exclusion, and the grounds cannot be changed on appeal [citation].".) Zaki makes no effort to explain why it would have been futile to object to any of the statements on the ground that the prosecutor improperly asked the jurors to place themselves in Monica's position. Nor does he explain why an admonishment would not have cured any potential harm caused by the statements. Zaki, therefore, has forfeited his challenges to the prosecutor's statements.

In any event, Zaki's arguments lack merit. A prosecutor may not make a "Golden Rule" argument by appealing " 'to the sympathy or passions of the jury' " and " 'urging them to imagine the suffering of the victim.' " (*People v. Vance* (2010) 188 Cal.App.4th 1182, 1192 (*Vance*).) " ' "[A]n appeal to the jury to view the crime through the eyes of the victim is misconduct… ." ' " (*Ibid.*)

The prosecutor did not make a "Golden Rule" argument in this case. Rather, her first two statements properly asked the jurors to apply their own life experiences and common sense when evaluating Monica's credibility based on her conduct following the underlying assault. (See *People v. Vigil* (2011) 191 Cal.App.4th 1474, 1487 [jurors are allowed to apply "their own common sense and life experience" when evaluating a witness's testimony].) As for the third statement, it merely asks the jurors to view Monica's conduct in light of the forensic psychologist's testimony explaining why some victims of sexual assault don't report the crimes to law enforcement. As we noted above, a prosecutor enjoys wide latitude when commenting on the evidence, and she may ask the jurors to draw reasonable

17

inferences based on the evidence. (*Williams*, *supra*, 16 Cal.4th at p. 221.) That's what the prosecutor did here. Nothing in the prosecutor's statements asks the jurors to imagine Monica's suffering or to "relive" the assault as she would have experienced it. (See *Vance*, *supra*, 188 Cal.App.4th at p. 1199 [misconduct for the prosecutor to ask the jury to "literally relive" in their minds' eyes what the victim felt and experienced during the commission of the offense].)

## 4. Defect in the Verdict Form

Lastly, Zaki contends we must reverse his conviction for forcible oral copulation because the guilty verdict form for Count 1 lists a provision of the Penal Code that does not exist. While it appears that part of the relevant Penal Code section was inadvertently omitted from the verdict form, any error was harmless.

In Count 1 of the information and amended information, the People charged Zaki with forcible oral copulation under section 288a, subdivision (c)(2)(A). The instructions provided to the jury state that Zaki was charged in Count 1 with forcible oral copulation in violation of "Penal Code section 288a(c)(2)." But the guilty verdict form for Count 1 provided to the jury states that Zaki was charged with "FORCIBLE ORAL COPULATION" under "Penal Code Section 288a((2)(A)." In other words, the verdict form omitted the letter "c" identifying the subdivision of section 288a under which Zaki was charged.

We must construe a verdict in light of the issues submitted to the jury and the instructions of the court. (*People v. Camacho* (2009) 171 Cal.App.4th 1269, 1272 (*Camacho*).) We may disregard technical defects in a verdict form if the jury's intent to convict the defendant of a specified charged offense is

18

unmistakably clear and the defects do not prejudice the defendant's substantial rights. (*People v. Webster* (1991) 54 Cal.3d 411, 447; see also §§ 1258, 1404.) In other words, " ' "the form of the verdict is immaterial if the intention to convict of the crime charged is unmistakably expressed. [Citations.]" [Citations.]' " (*Camacho*, at p. 1273.) If the defect is part of the recording, rather than the rendering, of the judgment, it is a clerical error that may be corrected or disregarded. (*Ibid*.)

It is evident from the circumstances of this case that the jury intended to convict Zaki of forcible oral copulation. The guilty verdict form for Count 1 included the correct name of the offense, even though it omitted part of the Penal Code section under which Zaki was charged. Further, the court's instructions for the charge of forcible oral copulation correctly describe the offense and its elements. In addition, during her closing argument, the prosecutor told the jury that Zaki was charged in Count 1 with forcible oral copulation, she described the elements of the offense, she discussed what evidence proved the elements of the offense, and she asked the jury to find defendant guilty of the offense. And defense counsel acknowledged during closing argument that Zaki was charged with forcible oral copulation in Count 1 and argued Zaki wasn't guilty of the offense because Monica consented to orally copulating him. Zaki fails to explain how, in light of these circumstances, he was prejudiced by the defect in the verdict form.[5] That defect, therefore, was harmless. (*Camacho*, *supra*, 171 Cal.App.4th at p. 1272.)

---

[5] Although Zaki points out that the Legislature renumbered the statute for forcible oral copulation after he committed the offense, he does not contend he was prejudiced by the People's decision to charge him with a violation of former section 288a, subdivision (c)(2)(A), as

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


LAVIN, J.

WE CONCUR:


EDMON, P. J.


EGERTON, J.

---

opposed to a violation of section 287, subdivision (c)(2)(A). In any event, we fail to see how Zaki could have been prejudiced since the charging documents state that he was charged with forcible oral copulation and the language of the statute for the offense remained the same after it was renumbered.